IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ALEX OTERO,

      Plaintiff,

v.                                                      No. 12-CV-1058 GBW/KBM

LANCE LONGHI and
NATHAN HARGER,

      Defendants.

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants' Motion for Summary Judgment and Qualified Immunity. *Doc. 26.* Having reviewed the accompanying briefing (*docs. 33, 34*), and being otherwise fully advised, the Court finds the Motion well-taken and will GRANT it.

I.    BACKGROUND

This case concerns constitutional and state tort violations that Plaintiff alleges Defendants committed against him after he entered the scene where a search warrant had just been executed. *See generally doc. 1*, Ex. A. On June 8, 2011, Defendants, officers with the Bernalillo County Sheriff's Department, arrived at 7545 Isleta Southwest, Albuquerque, New Mexico, to execute a search warrant related to suspected drug trafficking. *Id.* at ¶¶ 2, 3, 7–9. There were multiple residences on the property, all

accessible via the same shared driveway.  The search warrant covered only the smaller residence located behind Plaintiff's house ("the rear dwelling").  *Id.* at ¶ 8, 10, 13.

Not long after Defendants executed the search warrant on the rear dwelling, Plaintiff arrived home and drove into the shared driveway.  *Id.* at ¶ 15, 19.  When Defendants saw Plaintiff, they ordered him out of his truck.  *Id.* at ¶ 16, 20.  Before Plaintiff complied, Defendants pulled him from the vehicle and to the ground.  *Id.* at ¶ 24.  Plaintiff swore at the officers, and Defendants proceeded to handcuff him.  *Id.* at ¶ 26–27.

At some point, Defendants realized that Plaintiff was not involved in the criminal activity at the rear dwelling, and they released Plaintiff from the handcuffs.  *Id.* at ¶ 30, 32.  Shortly thereafter, Plaintiff reported experiencing chest pains and his family called for an ambulance.  *Id.* at ¶ 33, 35.  He was taken to the hospital, where he remained overnight.  *Id.* at ¶ 39.   No charges were filed against Plaintiff as a result of this incident.

Plaintiff's Complaint (*doc. 1*, Ex. A) raises the following claims: Count I – unlawful seizure under 42 U.S.C. § 1983; Count II – excessive force under 42 U.S.C. § 1983; and Count III – battery and false arrest in violation of New Mexico state law.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires that a party seeking summary judgment demonstrate that "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In our circuit, the moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002) (quoting *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991)) (internal quotations omitted).

Summary judgment is proper only if a reasonable trier of fact could not return a verdict for the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (citing *Celotex*, 477 U.S. at 323). Once the movant meets this burden, Rule 56(e) requires the non-moving party to designate specific facts showing that "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex*, 477 U.S. at 324. "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ." Fed. R. Civ. P. 56(c)(1)(A). All material facts set

forth in the motion and response which are not specifically controverted are deemed undisputed.  D.N.M.LR-Civ. 56.1(b).

The court must adhere to three principles when evaluating a motion for summary judgment.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  *See Liberty Lobby*, 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party.  *See Hunt v. Cromartie*, 526 U.S. 541, 551–54 (1999).  Third, the court cannot decide any issues of credibility.  *See Liberty Lobby*, 477 U.S. at 255.  However, if the non-moving party's story "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  In the end, "to survive the . . . motion, [the non-movant] need only present evidence from which a jury might return a verdict in his favor."  *Id*. at 257.

## III.   UNDISPUTED FACTS

1. On June 7, 2011, Defendant Longhi, a Detective with the Bernalillo County Sheriff's Department Narcotics Unit, obtained a search warrant for a residence located at 7545 Isleta Southwest, Albuquerque, New Mexico.  *Doc. 26*, Ex. A at 1–2.

2.  The property at 7545 Isleta includes three dwellings: the main dwelling, a smaller
    dwelling at the rear of the property, and a camper.  *Doc. 33*, Ex. 1 at 13:11-16.

3.  Plaintiff resided with his mother in the main dwelling.  *Doc. 1*, Ex. A at ¶¶ 6, 8–
    10.

4.  The search warrant covered only the smaller dwelling at the rear of the property.
    *Doc. 26*, Ex. A at 2; *doc. 33*, Ex. 2 at 6:13-17.

5.  The intended target named in the search warrant was Connie Moya, who lived in
    the smaller rear dwelling and was suspected of selling illegal narcotics,
    particularly heroin.  *Doc. 26*, Ex. A at 5.

6.  The only access to any of the residences on the property was a long, single-lane
    driveway.  *Doc. 1*, Ex. A at ¶ 13; *doc. 34*, Ex. G at 36:1-4.

7.  On June 8, 2011, Detective Longhi, Detective Harger, Sergeant Sharp, and other
    members of the Bernalillo County Sheriff's Department Narcotics Unit executed
    the search warrant for the rear dwelling at 7545 Isleta Southwest.  *Doc. 1*, Ex. A at
    ¶ 8.

8.  Sergeant Sharp was the on-scene supervisor.  *Doc. 33*, Ex. 1 at 12:24–13:5.

9.  Upon executing the search warrant, Defendant Longhi made contact with the
    target, Connie Moya, and began to question her.  *See generally doc. 33*, Ex. 1 at 25-
    27.

10. Moya advised the officers that her drug supplier was coming to the rear dwelling to deliver heroin.  *Doc. 33*, Ex. 1 at 27-28; Ex. 2 at 71:1, 19-20; Ex. 5 at ¶ 8.

11. Moya showed Defendant Longhi text messages from her supplier, which indicated he would be arriving imminently.  *Doc. 33*, Ex. 1 at 28:3-11, 48:17-22.

12. Moya described her drug supplier as a "bigger, older guy."  *Doc. 33*, Ex. 1 at 27:15-17.

13. Defendants performed a vehicle blocking maneuver along the shared driveway and waited for Moya's supplier to arrive on the scene.  *Doc. 1*, Ex. A at ¶¶ 14, 16; *doc. 26*, Ex. C-1 at 5.   The vehicles displayed flashing emergency lights.  *Doc. 26*, Exs. C-2, D & E-2; *doc. 33*, Ex. 1 at 39:6-19, 68:22-25, Ex. 2 at 26:17-19, 68:22-25; *doc. 34*, Ex. G at 73:25-74:25.

14. Plaintiff arrived at 7545 Isleta in a silver pickup truck and drove down the shared driveway.  *See doc. 1*, Ex. A at ¶ 15; *doc. 26*, Ex. C-2 at ¶ 3; Ex. D at ¶ 6; Ex. E-2 at ¶ 3.

15. Plaintiff is "a larger man."  *Doc. 33*, Ex. 2 at 47:15-17.

16. Defendants were wearing balaclavas that covered their faces, as well as clothing that had a Sheriff's insignia and displayed the word "Sheriff" on both sleeves as well as on the back.  *Doc. 33*, Ex. 1 at 61:6-12; Ex. 2 at 9:13-25.

17. Defendants ordered Plaintiff to shut off his vehicle, and ordered both Plaintiff and the male in the passenger seat to exit the truck.  *Doc. 1*, Ex. A at ¶ 20; *doc. 26*, Ex. C-2 at ¶ 11.

18. The passenger of the vehicle was compliant with Defendants' orders and quickly exited the vehicle.  *Doc. 26*, Ex. B at 1.

19. Plaintiff did not immediately shut off his vehicle or exit the truck.  *Doc. 26*, Ex. C-2 at ¶ 11.

20. At least one officer had a gun drawn and pointed toward Plaintiff.  *Doc. 33*, Ex. 1 at 61:15-22

21. When Plaintiff did not exit the vehicle, Defendant Longhi placed Plaintiff in an arm bar, thereby guiding him head first out of his vehicle and to the ground.  *Doc. 33*, Ex. 1 at 64:6–66:7.

22. Once Defendant Longhi made physical contact with Plaintiff,[1] Plaintiff was swearing at the officers.  *Doc. 33* at 7, 9, ¶ 25, 38.

23. Once Plaintiff was out of the vehicle,[2] officers observed that Plaintiff had a knife clipped to his shorts.  *Doc. 26*, Ex. C-1, C-2; *Doc. 33*, Ex. 2 at 83:14-84:1.

---

[1] When Plaintiff's swearing began is in dispute.  Defendants claim that Plaintiff immediately began swearing at the officers in response to their commands.  *Doc. 26* at 8, ¶ 26.  Plaintiff responds that "he only began to swear at Defendants after they swore at him and after they physically pulled him from the truck…."  *Doc. 33* at 7-8, ¶ 26.  While it is unclear when he claims the officers began swearing at him, it is clear that he was swearing at the officers by the time they made physical contact with him.  *Id*. at ¶ 38.  The undisputed fact above is constructed in the light most favorable to Plaintiff.
[2] When officers first observed Plaintiff's knife is in dispute.  Defendant Longhi states that he observed it while Plaintiff was still in the vehicle.  *Doc. 26*, Exs. C-1 & C-2.  Plaintiff disputes this by pointing to

24. Plaintiff scraped his knee as he reached the ground.  *Id.* at 66:6-7.

25. Detective Harger placed two sets of handcuffs on Plaintiff.  *Doc. 33*, Ex. 2 at 15-19.

26. Sergeant Sharp identified himself to Plaintiff as the sergeant on scene, and explained why the detectives were on the property.  *Doc. 26*, Ex. B at 1.

27. Defendants identified Plaintiff within thirty minutes or less, concluded that he was not Moya's drug supplier, and released him from the handcuffs.  *Doc. 33*, Ex. 1 at 68:4-13; *see also doc. 1*, Ex. A at ¶ 32.

28. Defendants asked Plaintiff whether he wanted them to call an ambulance for the injury on Plaintiff's knee and for his wrist.  Plaintiff declined, saying he had been "banged up a lot worse than this."  *Doc. 26*, Ex. C-1 at 5.

29. Plaintiff returned to his vehicle and drove to the side of the property, where he was able to unload at least one load of water bottles before entering the larger residence.  *Doc. 26*, Ex. B at 2; *Doc. 33*, Ex. 4 at ¶ 27.

30. Shortly thereafter, Plaintiff's mother called an ambulance because Plaintiff reported experiencing chest pains.  *Doc. 33*, Ex. 5 at ¶ 16.

31. When the ambulance arrived on scene, Plaintiff was carried to the ambulance on a stretcher and taken to the hospital.  *Doc. 26*, Ex. C-1 at 6.

---

Defendant Harger's statement that he observed it as Plaintiff was being pulled from the vehicle.  *Doc. 33*, Ex. 2 at 83:14-84:1.  The undisputed fact above is constructed in the light most favorable to Plaintiff.

A.  **Dispute Over Undisputed Facts**

Although the Court has laid out the facts it finds to be undisputed, further explanation is warranted.  For the seizure claim, the key facts focus on what the officers knew prior to stopping Plaintiff.  While Plaintiff claims to dispute virtually all of the facts relied upon by Defendants, a review of the evidence presented leaves several crucial facts undisputed.  Defendants, through their reports, affidavits and depositions, claim that Connie Moya advised them that her drug supplier would be arriving imminently, with heroin, to the residence the officers had just searched.  According to Defendants, she advised them that the supplier was a "bigger, older guy" and would be arriving in a silver truck or a blue car.  According to Defendants, she even showed the officers corroborating text messages from her supplier.

In his Response, Plaintiff disputes the paragraphs of Defendants' Motion which contain these assertions.  In support of the dispute, Plaintiff points to the same single piece of evidence—the affidavit of Connie Moya.  In that affidavit, Moya says, in relevant part, as follows: "On approximately June 8, 2011 I was in the small house when police arrived with a search warrant.  I was arrested by officers of the Bernalillo County Sheriff's Office.  I did not talk to officers about a silver pickup truck.  I did not talk to officers about any type or color of truck.  I did not tell officers a truck, or any other vehicle, was going to come to the house.  Further affiant sayeth not." *Doc. 33*, Ex. 3. Comparing this affidavit to the facts as asserted by Defendants leave the following facts

9

undisputed regarding what Moya advised the officers: (1) that her drug supplier was coming to the house; (2) that he was coming soon; (3) that he was bringing heroin; (4) that he was a bigger, older man; and (5) that she had received texts from him. Plaintiff argues that Moya's affidavit implies that these facts are in dispute. *Doc. 33* at 6, ¶¶ 13-14. The Court does not agree. Moya's affidavit is singularly focused on discussions about whether a vehicle was coming. There is no basis to infer a broader dispute regarding whether she communicated to the officers, in one fashion or another, that her supplier, whether in a vehicle or not, was about to arrive with a delivery of heroin. In apparent support for the inference he seeks, Plaintiff notes that Moya's deposition has not been taken. Of course, he had the opportunity to seek her deposition pursuant to Rule 56(d), but failed to request one. As presented, Moya's limited affidavit does not genuinely dispute any of the facts listed above.[3]

The next issue regarding undisputed facts relates to Plaintiff's compliance with the officers' commands when he was stopped. Defendants' Undisputed Fact #25 states that "Detective Longhi ordered the driver to shut the vehicle off; the driver refused." *Doc. 26* at 8, ¶ 25. In his response, Plaintiff disputes only that he "deliberately" refused to obey orders; he does not contend that he obeyed Defendant Longhi's command. *Doc.*

---

[3] In fact, the affidavit of Plaintiff's mother, which was submitted by Plaintiff, supports this limited interpretation of the nature of the dispute. In her affidavit, Ms. Otero states that "I later heard police officers telling Connie Moya to call in her supplier to deliver more drugs . . . . I did not hear Connie Moya tell them a silver truck was coming." *Doc. 33*, Ex. 5. Again, the dispute is not whether the officers had reason to believe Moya's supplier was going to appear, but whether he was going to arrive in a silver truck.

*33* at 7, ¶ 25.  The allegations in Plaintiff's complaint also suggest that he did not

immediately respond to Defendants.  He seems to excuse the delay by alleging he "was

confused and at first did not know whether the Defendants were law enforcement."

*Doc. 1*, Ex. A at ¶ 22.  Plaintiff also concedes that, after being ordered to get out of the

truck and before being removed, he "tried to tell Defendant Longhi that he lived in the

main house and he had a right to be there."  *Id.*, ¶¶ 20, 23.  In light of the foregoing, it is

undisputed that there was at least some delay in Plaintiff's obeying Defendant Longhi's

orders to shut off and exit the truck.  Moreover, this delay was not insignificant as the

passenger, who immediately complied, had time to exit the vehicle while Plaintiff

remained inside with the vehicle still running.  *Doc. 26* at 8, ¶ 23-25; *doc. 33* at 7, ¶ 23-25.


## IV.   PLAINTIFF'S FEDERAL CLAIMS

Plaintiff brings two federal claims for violations of his civil rights.  In Count I, he

alleges that Defendants violated his Fourth Amendment right to be free from

unreasonable searches and seizures when they detained him without reasonable

suspicion and arrested him without probable cause.  *Doc. 1*, Ex. A at ¶¶ 42–43.  In Count

II, Plaintiff claims that Defendants violated his right to be free from excessive force

"when they pulled Plaintiff from his truck, threw him to the floor and handcuffed him,"

as well as when they threatened to take Plaintiff's family into custody.  *Id.* at ¶ 50–51.

Defendants maintain they are entitled to qualified immunity with respect to both of Plaintiff's Fourth Amendment claims.  *Doc. 26* at 10.

## A. <u>Qualified immunity standard</u>

Qualified immunity protects public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff who must clear two hurdles to defeat the defendant's motion.  The plaintiff must demonstrate, on the facts alleged, that (1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged unlawful activity."  *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (internal citations omitted).  "A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that his actions violate that right . . . ."  *Id.*  Courts have discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Leverington v. City of Colo. Springs*, 643 F.3d 719, 732 (10th Cir. 2011).

**B.  Count I – Unlawful Seizure**

In Count I of his complaint, Plaintiff alleges that Defendants detained him without reasonable suspicion and arrested him without probable cause in violation of his Fourth Amendment rights when they established a roadblock on his driveway, approached him at gunpoint, pulled him out of his truck, and handcuffed him.  *Doc. 1*, Ex. A at ¶¶ 40-47.

Defendants argue that a reasonable officer in Defendants' position would have had reasonable suspicion to perform an investigatory stop based on the fact that "Plaintiff arrived on scene at the time the target said the drug supplier would arrive . . . ."  *Doc. 26* at 13.  Defendants further maintain that the stop never actually evolved into an arrest requiring probable cause.  Regardless, however, they contend that probable cause existed based on Plaintiff's resisting arrest, a misdemeanor under New Mexico state law.  *Id.*

**1.  *Defendants had reasonable suspicion to stop Plaintiff.***

To determine whether an investigative detention is lawful under the Fourth Amendment, we engage in a two-step inquiry.  *Chidester v. Utah Cnty.*, 268 F. App'x 718, 725 (10th Cir. 2008); *Gallegos v. City of Colo. Springs*, 114 F.3d 1024, 1028 (10th Cir. 1997); *United States v. King*, 990 F.2d 1552, 1557 (10th Cir. 1993).  An investigatory stop is reasonable if (1) it is "justified at its inception"—that is, an officer has reasonable suspicion that a person is involved in criminal activity—and (2) the scope of the stop is

"reasonably related . . . to the circumstances which justified the interference in the first place." *King*, 990 F.2d at 1557 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)).

With respect to the first step, reasonable suspicion is a lower standard than the probable cause required for an arrest: it requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop. *Terry*, 392 U.S. at 21.  "In reviewing an investigatory stop for reasonable suspicion, we must consider 'the totality of the circumstances' of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Neff*, 681 F.3d 1134, 1138 (10th Cir. 2012) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).  "[S]howing reasonable suspicion is a low burden that is generally easy for an officer to meet." *Sisneros v. Fisher*, 685 F. Supp. 2d 1188, 1214 (D.N.M. 2010).

As discussed above, Plaintiff has not created a genuine dispute of the following material facts: (1) that Moya advised the officers that her drug supplier was coming to the house; (2) that he was coming soon; (3) that he was bringing heroin; (4) that he was a bigger, older man; (5) that the driveway was used by only three residences; and (6) that Plaintiff is also a "larger" man.  When Plaintiff came driving down that driveway,

at precisely the time Moya predicted the arrival of her drug supplier, the officers had

reasonable suspicion that the drug supplier was in that vehicle in possession of heroin.[4]

Plaintiff argues that the officers essentially set up "an illegal roadblock on the

communal driveway leading to [Plaintiff's] home." *Doc. 33* at 12.  He alleges that

Defendants had no particularized basis for stopping him because they would have

stopped anyone who came down the driveway.  Given this framing, Plaintiff points to

*United States v. Neff* as authority for the stop's illegality.  *Id.* (citing 681 F.3d at 1138).

However, Plaintiff's case bears little resemblance to *Neff*, in which law enforcement

officers had set up a ruse drug checkpoint on a highway and monitored cars that exited

the highway after seeing signs for the false checkpoint.  In that case, the Tenth Circuit

found that, because the suspect's actions were entirely consistent with innocent travel,

Defendants did not have reasonable suspicion to believe criminal activity was afoot.  *Id.*

at 1142.  Here, in contrast, the Defendants had a precise reason to believe criminal

activity was afoot at that very location — they had been informed that the suspect

would be arriving imminently for the purpose of engaging in an illegal activity.

In reaching the holding in *Neff*, the Tenth Circuit also recognized that, while

"*Terry* accepts the risk that officers may stop innocent people . . ., the articulated factors

---

[4] Plaintiff contends that Defendants had already executed the search warrant when Plaintiff arrived on the scene, and therefore cannot rely on the rule that police may detain occupants of the place being searched while the warrant is being executed.  *See Michigan v. Summers*, 452 U.S. 692, 705 (1981).  Because the Court concludes that the stop would have been justified even assuming the search warrant had already been executed, it need not determine whether the execution of the search warrant was still in progress at the time Plaintiff was stopped.

together must serve to ***eliminate a substantial portion of innocent travelers*** before the requirement of reasonable suspicion will be satisfied." *Id.* at 1142 (emphasis added). In Plaintiff's case, there was little danger of Defendants stopping a substantial number of innocent individuals. In the first instance, Defendants stopped Plaintiff's vehicle on a driveway in a rural area where few cars would be expected to pass, and not on a public highway as in *Neff.* Second, Defendants were not monitoring all passersby for potentially evasive behavior. Rather, they were waiting for a particular individual they had reason to believe would be arriving at a specific time to engage in illegal activity. While Plaintiff devotes considerable time to disputing whether Moya accurately described her supplier's truck as resembling his own, the broader point is that Defendants were expecting Moya's supplier to arrive at the precise time that Plaintiff entered the shared driveway. The fact that Defendants were ultimately mistaken about Plaintiff's identity does not change the fact that they had reasonable suspicion to believe that the vehicle they stopped was occupied by Moya's drug supplier. *See United States v. Tibbetts*, 396 F.3d 1132, 1138 (10th Cir. 2005) ("We have consistently held that an officer's mistake of fact, as distinguished from a mistake of law, may support probable cause or reasonable suspicion . . . .").

Defendants have set forth "specific and articulable facts" that reasonably warranted an investigatory stop. *Terry*, 392 U.S. at 21. The Court therefore finds that Defendants had reasonable suspicion to stop Plaintiff.

16

2. *The investigative detention of Plaintiff did not evolve into an arrest.*

Having concluded that Defendants were justified in stopping Plaintiff, the Court

will now determine whether Plaintiff's detention escalated into an arrest requiring

probable cause.

Under the second step of the inquiry to determine whether an investigative

detention is lawful, an officer's actions must be "reasonably related in scope to the

circumstances which justified the interference in the first place." *Gallegos*, 114 F.3d at

1028 (internal quotations omitted).  Otherwise, the "investigative detention evolves into

an arrest . . . ." *Manzanares v. Higdon*, 575 F.3d 1135, 1148 (10th Cir. 2009) (citing *United*

*States v. Melendez–Garcia,* 28 F.3d 1046, 1051 (10th Cir. 1994)).  While forceful techniques

such as the use of firearms and handcuffs are often indicative of an arrest, they are not

dispositive of the inquiry.  In fact, "[a]lthough *Terry* stops are normally non-intrusive,

[the Tenth Circuit has] indicated that law enforcement may (1) display some force, (2)

place suspects on the ground, (3) use handcuffs, or (4) detain suspects in law

enforcement vehicles, even in the absence of probable cause." *Cortez v. McCauley*, 478

F.3d 1108, 1130 (10th Cir. 2007).  "As long as the precautionary measures employed by

officers during a *Terry* stop are reasonable, they will be permitted without a showing of

probable cause." *Gallegos v. City of Colorado*, 114 F.3d 1024, 1030 (10th Cir. 1997).  Even

"the use of guns in connection with a stop is permissible where the police reasonably

believe the weapons are necessary for their protection." *United States v. Perdue*, 8 F.3d

1445, 1462 (10th Cir. 1993) (quoting *United States v. Merritt*, 695 F.2d 1263, 1273 (10th Cir. 1982).  The reasonableness of officers' actions should be assessed based on the totality of the circumstances confronting them at each point of an investigatory stop.  *Id.*

Plaintiff contends that the techniques used by the officers, such as "[t]he use of handcuffs, the forcible removal from the truck, the boot in the back, the obscenities yelled by officers all point to a governmental intrusion rising to the level of an arrest." *Doc. 33* at 17.

For this analysis, the Court finds it useful to divide the events surrounding Plaintiff's physical detention into two phases.  In the first phase, the following facts are undisputed: (1) the officers had reasonable suspicion to believe that the occupants of the arriving vehicle included Moya's drug supplier whose purpose there was to deliver illegal narcotics;[5] (2) Moya described her drug supplier as a bigger man, which is a description that fits Plaintiff; (3) the officers began the stop by blocking Plaintiff's vehicle with their vehicles, which were displaying emergency flashing lights;[6] (4) some officers were wearing items which covered their faces, but all were wearing clothing with badges or other Sheriff's Department insignia visible; (5) the officers yelled commands at Plaintiff to shut off the vehicle and exit the vehicle; (6) at least one officer

---

[5] The Court recognizes that Plaintiff disputes this legal conclusion.  However, as discussed above, the Court concludes that there was reasonable suspicion on the basis of facts which are undisputed.  In short, this "undisputed" fact simply stands in for the underlying undisputed facts on which the Court based its ruling as to reasonable suspicion.  *See supra* Section IV.B.1 at 14.
[6] *See doc. 26*, Exs. C-2, D & E-2; *doc. 33*, Ex. 1 at 39:6-19, 68:22-25, Ex. 2 at 26:17-19, 68:22-25; *doc. 34*, Ex. G at 73:25-74:25.

had a gun drawn and pointed at Plaintiff; (7) while the passenger complied by quickly exiting the vehicle, Plaintiff did not immediately shut off the vehicle or exit it; and (8) after the passenger exited but Plaintiff was still in the vehicle, Plaintiff was forcibly dragged out of the car by the officers.

In the second phase, which begins as Plaintiff was being removed from the vehicle, the following facts are undisputed: (1) Plaintiff was swearing at the officers; (2) the officers observed a knife clipped to Plaintiff's shorts;[7] and (3) the officers handcuffed Plaintiff. While Defendants dispute it, it is at this time that Plaintiff claims an officer shoved a boot into his back. Plaintiff was released within thirty minutes, after his identity was confirmed.

During the first phase of Plaintiff's detention, the question is whether the officers' commands to exit the vehicle with their guns drawn were "reasonably related in scope to the circumstances which justified the interference in the first place." Having determined that the officers had reasonable suspicion to stop Plaintiff's vehicle, there is little doubt that ordering the occupants to exit the vehicle was within the scope of the *Terry* stop. *See Maryland v. Wilson*, 519 U.S. 408 (1997). The closer question relates to the fact that the commands were given while at least one officer was pointing his gun at Plaintiff and the passenger.

---

[7] Defendants contend that the knife was observed earlier but, for the purposes of this motion, the Court must view the facts in the light most favorable to Plaintiff.

This stop was based on the suspicion of drug trafficking.  Drugs and guns and violence often go together, which supports the argument that the use of the firearms was reasonable.  *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994). Of course, "the naked fact that drugs are suspected will not support a per se justification for use of guns and handcuffs in a *Terry* stop." *Id*. at 1053.  Consequently, even if drug trafficking is suspected, the Tenth Circuit has found that the use of both firearms and handcuffs is beyond the permissible scope of a *Terry* stop where the officers "outnumbered the defendants, executed the stop on an open highway during the day, had no tips or observations that the suspects were armed or violent, and the defendants had pulled their cars to a stop off the road and stepped out of their cars in full compliance with police orders." *Id*.

The instant case, however, is significantly dissimilar to *Melendez-Garcia*.  First, the stop did not occur on an open highway.  Instead, it occurred on a private driveway in a rural area amongst residences.  This difference significantly increased the inherent danger given the officers' reduced ability to maintain a safe separation after conducting the stop.  Second, Plaintiff did not immediately and overtly comply with the officers' show of authority as the *Melendez-Garcia* defendants had.  Instead, unlike his passenger, Plaintiff delayed in complying with the orders being given.  The circumstances of the suspected drug trafficking involved in the instant case are also quite different from those of *Melendez-Garcia*.  In *Melendez-Garcia*, the officers believed that the load vehicle

was on a long trip transporting marijuana from New Mexico to California.  *Id*. at 1049.

So, when the vehicle was stopped in New Mexico, the occupants were far from the

anticipated interaction with the persons who would be receiving the marijuana.  In

contrast, in the instant case, the officers reasonably believed that the occupants of

Plaintiff's vehicle were arriving to hand over the heroin at that time and at that location.

As such, the odds that they would be armed were significantly higher.  As many courts

have recognized, "guns are tools of the narcotics trade, frequently carried by dealers,

particularly when they engage in transactions involving drugs or money."  *United States*

*v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004); *see, e.g.*, *United States v. Shields*, 664 F.3d 1040,

1046 (6th Cir. 2011) ("[I]t is easier to see how a firearm facilitates drug trafficking

transactions, than it is to see how a firearm facilitates the mere possession of controlled

substances.  In a drug transaction, the offender must hold onto the drugs long enough

to transfer them to another person, and make sure he gets money in return.").

Perhaps most significantly, *Melendez-Garcia* is distinguishable because the

officers in that case not only pointed their weapons at the suspects, but also restrained

them with handcuffs.  Here, although the Defendants did eventually handcuff Plaintiff,

he was not yet restrained during the first phase of the stop.  Rather, Defendants waited

to employ handcuffs until the second phase of Plaintiff's detention; the Court must

therefore evaluate the reasonableness of this additional technique in light of the facts

facing the officers at that later time.  Considering the totality of the circumstances

confronting the officers at phase one of the stop, when Plaintiff's vehicle began driving

up the driveway, it was reasonable for them to order the occupants to exit at gunpoint.

Turning then to the second phase, the question becomes whether the officers'

subsequent actions remained reasonable.  Plaintiff's complaints which fall into this

phase consist of the rough fashion in which he was brought to the ground (including a

boot to the back), and the use of handcuffs.  As discussed above, handcuffing a suspect

is atypical of a *Terry* stop and, like the use of firearms, is a factor to consider in assessing

whether an investigatory detention has evolved into an arrest.  *Perdue*, 8 F.3d at 1463.

However, this additional forceful technique may be used during the course of a *Terry*

stop if reasonable under the circumstances.  *Id.; see also United States v. Perea*, 374 F.

Supp. 2d 961, 975-76 (D.N.M. 2005) (concluding that a detention did not evolve into an

arrest because the use of both guns and handcuffs was reasonable in light of concerns

for officer safety).

In addition to the circumstances described above which justified the issuing of

commands at gunpoint, the danger facing the officers increased during this phase.

Specifically, Plaintiff began swearing at the officers and the officers observed that he

was in possession of a knife.  With respect to the swearing, Plaintiff explains that he

began swearing only because the officers were swearing at him and he thought he was a

victim of a car-jacking.  Even accepting the same as true, it does not change the fact that,

from the perspective of a reasonable officer, the verbal sparring indicated a combative

disposition.  With respect to the knife, it goes without saying that observing the knife

increased the risk to all concerned, and, therefore, the justification for further

precautionary measures during the stop.  *Id.* at 1462.  Finally, Plaintiff was detained for

less than thirty minutes while Defendants determined his identity and was not moved

from the scene.  These facts further support the argument that his detention did not

exceed the scope of a *Terry* stop.  *See Manzanares v. Higdon*, 575 F.3d 1135, 1148 (10th Cir.

2009) ("[B]revity . . . is an important factor in determining whether the seizure is so

minimally intrusive as to be justifiable on reasonable suspicion.") (internal quotation

omitted).  Consequently, neither the roughness of the arrest nor the handcuffing of

Plaintiff was unreasonable based on the circumstances known to the officers at the

relevant moments.

In conclusion, the Court finds that the precautionary measures employed by the

officers during the *Terry* stop of Plaintiff were reasonable when they were employed.

As such, Plaintiff's detention did not rise to the level of an arrest requiring probable

cause.  Having found that the officers possessed reasonable suspicion justifying the

*Terry* stop, Plaintiff has failed to establish that his seizure violated his constitutional

rights.  Therefore, the Court will grant Defendants' motion for summary judgment on

Count I on the basis of qualified immunity.

**C.  <u>Count II – Excessive Force</u>**

In Count II, Plaintiff alleges that Defendants used excessive force when they "grabbed Plaintiff and pulled him out of the truck while he was wearing his seat belt," "threw him to the floor and handcuffed him."  *Doc. 1*, Ex. A at ¶¶ 24, 50.  He further contends that Defendant Harger "pushed his boot into Plaintiff's back as he lay on the floor" and that Defendant Longhi "threatened to take Plaintiff's family into custody if he had a problem with what they were doing."[8]  *Doc. 1*, Ex. A at ¶¶ 28, 51.  Defendants counter that neither officer pushed his boot into Plaintiff's back while handcuffing him, and they argue that the use of force was reasonable in light of Plaintiff's "resistance and belligerent behavior."  *Doc. 7* at 14.

The use of force in an investigatory stop or arrest is governed by the Fourth Amendment's reasonableness standard.  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  "[T]he excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case."  *Cortez*, 478 F.3d at 1126.  "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham*, 490 U.S. at 396.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates

---

[8] Plaintiff has not pointed to any case, nor is the Court aware of any precedent, that would support a finding of excessive force based on Defendant Longhi's alleged statement "Do you and I have a problem with this? Cos I can take your whole family in if you do."  *Doc. 1*, Ex. A at ¶ 31.  Although physical contact is not required to make a claim of physical force, a plaintiff must generally allege at least a *threat* of physical force.  *See Martin v. Bd. of Cnty. Comm'rs of Cnty. of Pueblo*, 909 F.2d 402, 406-07 (10th Cir. 1990).

the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 397.

A police officer uses excessive force in detaining a suspect if his actions were not "objectively reasonable in light of the facts and circumstances confronting [him]."  *Id.* at 397; *see also Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009).  An evaluation of reasonableness requires a fact-specific evaluation of the totality of the circumstances surrounding the event at issue, made from the perspective of "a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396-97; *Thomson v. Salt Lake County,* 584 F.3d 1304, 1313 (10th Cir. 2009).  In assessing the reasonableness of the officer's actions, a court may consider, among other factors, (1) the severity of the crime in question, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting or attempting to evade arrest.  *Graham,* 490 U.S. at 396.

Taking each factor in turn, the Court first considers the severity of the crime at issue.  Here, Defendants had reason to believe that Plaintiff was about to engage in a transaction to sell heroin, a felony under New Mexico law and the most serious of the three classes of state criminal offenses.  *See* N.M. STAT. ANN. §§ 30–1–6; 30-31-20 (1978). The first factor therefore weighs in favor of Defendants.

The second factor, whether the suspect poses an immediate threat to the safety of the officers or others, will be considered in the phased approach utilized for the Court's seizure analysis. *See supra* Section IV.B.2 at 17-18. The only use of excessive force alleged by Plaintiff which occurred in the first phase of the stop was that the officers "grabbed Plaintiff and pulled him out of the truck while he was wearing his seat belt." *Doc. 1*, Ex. A at ¶ 24. At this moment, Plaintiff was reasonably suspected of involvement in the imminent delivery of heroin. As noted above, this fact significantly heightened the likelihood that Plaintiff was armed with a firearm or other weapon. Also, Plaintiff was not immediately compliant with the lawful orders of the officers and remained in the vehicle despite the fact that his passenger had exited.

Turning to the second phase, Plaintiff's relevant complaints are that the officers threw him to the floor, handcuffed him, and pushed a boot into his back. The threat posed by Plaintiff also increased during this phase. Specifically, Plaintiff began swearing at the officers and the officers observed that he was in possession of a knife. Even accepting Plaintiff's contention that he began swearing only because the officers were swearing at him and he thought he was a victim of a car-jacking, a reasonable officer could still have concluded that Plaintiff's behavior indicated an aggressive disposition which heightened the threat of the situation. The fact that Plaintiff possessed a knife also undoubtedly increased the risk he posed to the officers. Under the circumstances relevant to each phase of the stop, the officers' conduct was

26

reasonably related to the threat posed by Plaintiff at the given moment.  The second factor therefore weighs in favor of Defendants.

The third *Graham* factor is whether the suspect was actively resisting or attempting to evade arrest.  Viewing the facts in the light most favorable to Plaintiff, he did not fight against the officers or flee.  Yet it is undisputed that he did not immediately comply and, after the officers began to pull him from the vehicle, was swearing at the officers.  This "resistance" could be characterized as "passive" as opposed to "active."  However, the "Tenth Circuit [has] found that the third *Graham* factor weighed in favor of reasonableness despite the plaintiff's simply refusing to obey orders or get out of her car."  *Rodeman v. Foster*, 767 F. Supp. 2d 1176, 1185 (D. Colo. 2011) (citing *Mechem v. Frazier*, 500 F.3d 1200, 1204-05 (10th Cir. 2007)); *cf. Bailey v. Silver*, No. 13-5046, 2014 WL 185539, at *2 (10th Cir. Jan. 17, 2014) (upholding district court's granting of summary judgment in favor of officer who broke noncomplying suspect's ribs after tackling him to the ground via an arm bar and placing his knee in his back while handcuffing him).  Balancing Plaintiff's non-compliance and verbal combativeness with the lack of significant active physical resistance leads this Court to conclude that the third factor weighs in neither party's favor.

Finally, although Plaintiff has created a genuine dispute of fact on the issue of whether he suffered an actual injury that was not *de minimis*, it is clear that his injuries were not serious.  Plaintiff does not dispute that he initially refused medical treatment,

that he told the officers he had been "banged up" a lot worse in the past, or that he was able to unload water bottles from his vehicle moments after the encounter. "A court must consider the extent of the injury inflicted by the use of force when evaluating a claim of unreasonable force." *See Rucker v. Hampton*, 49 F. App'x 806, 809 (10th Cir. 2002). Thus, the nature of Plaintiff's injuries also supports the conclusion that excessive force was not used.

Under the totality of the circumstances, the Court finds that Plaintiff has failed to establish that the officers violated his constitutional rights by using excessive force. Therefore, the Court will grant Defendants' motion for summary judgment on Count II on the basis of qualified immunity.

### V.    PLAINTIFF'S STATE LAW CLAIMS

In addition to his federal claims, Plaintiff brings two state tort claims against Defendants. In Count III, Plaintiff claims that Defendants committed false arrest and battery upon Plaintiff when they "pulled him out of his truck while a seatbelt was over his shoulder," threw him to the ground, handcuffed him, and "shoved a boot in his back." *Doc. 1*, Ex. A at ¶¶ 56-58. Plaintiff concedes that, if the Court grants summary judgment as to Counts I and II, his state tort claims in Count III would also fail. *See doc. 33* at 20.

28

A.  **Count III – Battery**

Under New Mexico law, a police officer may be liable for negligence that results in a specifically enumerated tort under the New Mexico Tort Claims Act (NMTCA), including battery.  N.M. STAT ANN. § 41-4-12 (1978); *Caillouette v. Hercules, Inc.*, 827 P.2d 1306, 1311 (N.M. Ct. App.  1992).  "[A] claim arising out of one of the common-law torts enumerated within the Section 41-4-12 waiver of immunity is essentially a common-law negligence claim, and the plaintiff need only show a violation of a common-law duty."  *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dept.*, 916 P.2d 1313, 1319 (N.M. Ct. App. 1996) (citing *Blea v. City of Espanola*, 870 P.2d 755, 758-59 (N.M. Ct. App. 1994)).

A person is subject to civil liability for battery if "'he [or she] acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and . . . an offensive contact with the person of the other directly or indirectly results.'"  *State v. Ortega*, 827 P.2d 152, 155 (N.M. Ct. App. 1992).  However, a police officer will not be liable for battery so long as he acted in good faith and only used the force reasonably necessary under the circumstances.  *See Jonas v. Bd. of Comm'rs of Luna Cnty.*, 699 F. Supp. 2d 1284, 1297 (D.N.M. 2010) (citing *State v. Gonzales*, 642 P.2d 210, 213 (N.M. Ct. App. 1982)).  The test for reasonableness in a state law battery claim is analogous to the test for excessive force in *Graham*.  *Id.*; *Hernandez ex rel. Estate of Medrano v. Frias*, No. 10-0351, 2011 WL 1127882, at *25 (D.N.M. Mar. 15, 2011) (comparing excessive force claim to state battery claim).

29

The Court has concluded that Defendants' use of force was reasonable under *Graham* given the circumstances and the information known to the officers at the time they detained Plaintiff. *See supra* Section IV.C. Additionally, because Plaintiff has not demonstrated that Defendants acted in bad faith, Defendants are entitled to summary judgment on this claim.

**B.   Count III – False Arrest**

The NMTCA also specifically waives immunity for law enforcement officers sued for false imprisonment or false arrest. N.M. Stat. § 41-4-12. "The tort of false imprisonment occurs when a person intentionally confines or restrains another person without consent and with knowledge that he has no lawful authority to do so." *Santillo v. N.M. Dep't of Pub. Safety*, 173 P.3d 6, 10 (N.M. Ct. App. 2007). Unlawful detention has similar requirements: a law enforcement officer must reasonably believe that detaining the individual is appropriate to preserve the peace or to further an investigation. *See Romero v. Sanchez*, 895 P.2d 212, 215-216 (N.M. 1995).

Here, because Plaintiff's investigatory detention did not evolve into an arrest, his claim arguably fails on that basis. *See St. John v. McColley*, 653 F. Supp. 2d 1155, 1165-66 (D.N.M. 2009) ("Without an arrest, there can be no viable claim for false arrest."). Moreover, the Court has already determined that the stop of Plaintiff was lawful because Defendants had reasonable suspicion to believe Plaintiff was involved in criminal activity and that a detention was appropriate under the circumstances. *See*

*supra* Section IV.B.  Defendants are thus entitled to summary judgment on Plaintiff's

false imprisonment claim.

**VI.    CONCLUSION**

For the foregoing reasons, the Court finds that Defendants are entitled to

summary judgment as to Plaintiff's federal claims for unlawful seizure and excessive

force and as to his state tort claims.  Defendants' Motion for Summary Judgment (*doc.*

*26*) is therefore GRANTED.


_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by consent**


31